UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>HINESVILLE HOUSING AUTHORITY, HINESHOUSE PROPERTY MANAGEMENT AND MAINTENANCE SERVICE, INC., HINESVILLE LEASED HOUSING CORPORATION, and MELANIE THOMPSON,<br><br>Defendants. | CASE NO.:<br><br><br><br>COMPLAINT<br><br>**DEMAND FOR JURY TRIAL** |

The United States of America ("United States") alleges as follows:

## NATURE OF THE ACTION

1. This action is brought by the United States to enforce Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988 ("Fair Housing Act"), 42 U.S.C. §§ 3601-3631.  It is brought on behalf of Complainant Chakehisia Santos ("Complainant"), pursuant to 42 U.S.C. § 3612(o).

## JURISDICTION AND VENUE

2. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345, and 42 U.S.C. § 3612(o).

3. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the United States' claims occurred there.

1

## RELEVANT PARTIES AND THE SUBJECT PROPERTY

4. At the times relevant to the Complaint, Complainant and her five minor children were tenants of an apartment located at Regency Park Apartments, 100 Regency Place in Hinesville, Liberty County, Georgia (the "Subject Property").

5. Defendant Hinesville Housing Authority ("HHA") is a public housing authority located in Hinesville, Georgia.

6. At the times relevant to this Complaint, Defendant HHA subsidized the Subject Property through its Project-Based Rental Assistance Program under 42 U.S.C. § 1437f and was identified as the owner of the Subject Property in submissions to the U.S. Department of Housing and Urban Development ("HUD").

7. Defendant HHA is governed by a Board of Commissioners appointed by the Hinesville mayor and council.  Per Defendant HHA's website, the Board of Commissioners "provide insight on administration, finances, development, programs, and services of the Hinesville Housing Authority and its subsidiaries."  Hinesville Housing Authority, Board of Commissioners, *available at* https://hinesvillehousingauthority.org/about-us/board-of-commissioners/ (last visited September 28, 2023).

8. Defendant Hineshouse Property Management and Maintenance Service, Inc. ("HPMMS"), a private corporate affiliate of Defendant HHA, is a Georgia non-profit corporation with its principal place of business in Hinesville, Georgia.

9. At the times relevant to this Complaint, Defendant HPMMS managed the Subject Property pursuant to a memorandum of understanding with Defendant HHA and was identified as the landlord on Complainant's lease.

2

10. At the times relevant to the Complaint, Defendant HPMMS employed staff that managed and maintained the Subject Property.

11. Defendant Hinesville Leased Housing Corporation ("HLHC"), a private corporate affiliate of Defendant HHA, is a Georgia non-profit corporation with its principal place of business in Hinesville, Georgia.

12. At the times relevant to this Complaint, Defendant HLHC, according to Liberty County property records, owned the Subject Property.

13. At the times relevant to the Complaint, per annual registration filings with the Georgia Secretary of State, the Chairman and Vice Chairman of the Board of Commissioners of Defendant HHA have served as the CEO and CFO, respectively, of Defendant HPMMS and Defendant HLHC.

14. Defendant Melanie Thompson is a resident of Savannah, Georgia.

15. Defendant Thompson is identified as the "CEO" of Defendant HHA on its website.  Hinesville Housing Authority, "Our CEO," *available at* https://hinesvillehousingauthority.org/about-us/our-team/ (last visited September 28, 2023).

16. According to Defendant HHA's website, Defendant Thompson, in her capacity as CEO of Defendant HHA, "is responsible for managing the agency's Project-Based Rental Assistance (PBRA) properties to maintain compliance in regards to U.S. Department of Housing and Urban Development (HUD) policies, to establish working relationships with the tenants, city/county government, and the general public and community services agencies." *Id.*

17. At the times relevant to the Complaint, Defendant Thompson supervised Defendant HPMMS staff who managed and maintained the Subject Property.  In this role,

3

Defendant Thompson provided on-site assistance at the Subject Property to Defendant HPMMS staff and met with tenants at the Subject Property as needed.

18. At the times relevant to the Complaint, Defendant Thompson, per annual registration filings with the Georgia Secretary of State, served as the secretary of Defendants HPMMS and HLHC.

19. At the times relevant to the Complaint, Defendant Thompson had authority to act on behalf of Defendants HHA, HPMMS, and HLHC to manage the Subject Property. Defendant Thompson performed management duties at the Subject Property as an agent of Defendants HHA, HPMMS, and HLHC.

20. Defendant Thompson's unlawful housing practices occurred within the scope of her agency relationship with Defendants HHA, HPMMS, and HLHC, and were aided by the existence of that agency relationship.

## FACTUAL ALLEGATIONS

21. On or about December 16, 2019, Complainant signed a lease with Defendant HPMMS and moved into the Subject Property with her five children.

22. Complainant's rent was fully subsidized, and she paid $0 per month per her lease.

23. From December 2019 through July 2021, Complainant and her family lived at the Subject Property without receiving a single lease violation notice from Defendants.

**Complainant Complains Internally; Defendants Interfere and Retaliate in Response**

24. On or about July 29, 2021, Complainant unexpectedly received a "Late Rent Notice" from Defendant HPMMS, indicating that Complainant owed $48. The Notice further stated that if full payment, including late fees, was not made by August 15, 2021, Defendant HPMMS would commence eviction proceedings.

4

25. Complainant was confused by the Late Rent Notice because she paid $0 per month under her lease, so she attempted to call the office of Defendant HPMMS several times for an explanation.

26. On or about July 30, 2021, Complainant called the office of Defendant HPMMS, spoke with then-HPMMS employee Yantee Turner, and asked to discuss the Notice with a manager.  Mr. Turner indicated that someone would call Complainant back and hung up on her.  Complainant called Mr. Turner back to provide her contact information, as he had ended the first call without asking for her contact information.  After she provided it, Mr. Turner hung up on her again.  Complainant called the office again, with no response.

27. Later that day, Complainant encountered a maintenance employee of Defendant HPMMS.  She asked the employee whether anyone was working in the office that day.  He told her that Mr. Turner and the Subject Property's asset manager, Pamela Ogden, then an employee of Defendant HPMMS, were in the office.  Complainant asked the employee how to file a complaint against Mr. Turner.  The employee took down Complainant's name and phone number and indicated that someone would give her a call.

28. Later in the day on July 30, 2021, Complainant returned from grocery shopping to find a "Notice of Lease Violation – Final Notice" posted to her door.  Complainant had received no prior notices of alleged lease violations before receiving this "Final Notice."

29. The Final Notice stated, in relevant part: "The following Lease Violation(s) have been discovered and have been recorded in your tenant file: . . . . [X] Other . . . . Explanation: Unauthorized person in unit."  The Final Notice also stated: "Take the action necessary to correct the above-named problems within <u>immediately</u> [*sic*] days."  No additional detail or supporting evidence accompanied the Final Notice.

5

30. On or about August 1, 2021, Complainant and her children attempted to attend a school supplies event for residents at Defendant HPMMS' office. When Complainant and her children rang the doorbell of the office, Mr. Turner saw the Complainant and her children but turned away and did not let them enter.

31. On or about August 3, 2021, after attempting to call Ms. Ogden, the asset manager for the Subject Property, several times, Complainant sent Ms. Ogden an email in which she detailed her concerns regarding Mr. Turner and disputed the Late Rent Notice and the Notice of Lease Violation – Final Notice.

32. Of note, Complainant stated that she believed Mr. Turner issued the Notice of Lease Violation – Final Notice in retaliation for Complainant asking how to file a complaint against Mr. Turner.

33. Also in her email, Complainant stated that her child had asked her whether Mr. Turner had denied their family access to the school supplies event because her child is biracial. Complainant added that she and her children felt "discriminated against," "harassed," and "bullied."

34. Complainant concluded her email by stating that she intended to file a complaint with a local fair housing advocacy organization and the Mayor of Hinesville.

35. On or about August 3, 2021, Ms. Ogden replied to Complainant's email and copied Defendant Thompson. Ms. Ogden stated that Complainant could come to the office the following morning to discuss Complainant's email.

36. On or about August 4, 2021, Complainant met with Ms. Ogden and Defendant Thompson.

6

37. During the meeting, Complainant denied having an unauthorized person in her unit. Complainant explained that she does not drive and that the person assisting her family with transportation does not live with them.

38. As reflected in an audio recording of the meeting, Defendant Thompson told Complainant that "the documentation now is in your file" of an unauthorized person being in Complainant's unit. Ms. Ogden claimed to have "witnesses" to prove that an unauthorized person was in Complainant's unit. At no point during the meeting were the "witnesses" identified.

39. When Complainant asked why she had not received a first notice regarding the alleged unauthorized person before the Final Notice, Ms. Ogden informed her that she, as the manager, decided that the notice was final.

40. During the meeting, Defendant Thompson also indicated that her office had received a report of illegal drug activity in Complainant's home.

41. Defendants had never accused Complainant of drug activity at any time during her tenancy at the Subject Property until one day after she sent an email in which she complained of discrimination and expressed her intent to file a fair housing complaint.

42. Complainant flatly denied the allegation of drug activity.

43. Complainant requested that the allegation of drug activity be put in writing and asked why it had not been included in the written Final Notice she had just received. In response, Ms. Ogden indicated that she did not have witnesses to the drug activity and would not put something in writing that she could not prove in court.

44. During the meeting, Defendant Thompson told Complainant, "What I want you to understand is we are the le - - - [incomplete word], we are the owners of the property. We can

7

determine whether we will renew your lease or not, irregardless [*sic*] if you're paying rent or not, because we want to make sure that people that's residing on our properties are compliant."

45. Defendant Thompson also stated during the meeting: "I also have a problem and will not tolerate residents making insinuations, lying, um, um, broadcasting or making the tone of the property unsettled when things don't move and go the way they want it to."

**Complainant Files Complaint with HUD; Defendants Evict Her**

46. Despite Defendants' efforts to deter her, Complainant proceeded to file a fair housing complaint with HUD against Defendant HHA, Defendant HLHC, Defendant Thompson, Ms. Ogden, and Mr. Turner on or about September 21, 2021.

47. Defendants received notice of Complainant's fair housing complaint by certified mail from HUD on or about October 2, 2021.

48. On or about October 7, 2021, only five days after receiving notice of Complainant's fair housing complaint, Defendant HPMMS issued Complainant a "Notice of Lease Non-Renewal – EVICTION NOTICE."

49. The Eviction Notice stated: "Hineshouse Property Management and Maintenance Services will not be renewing your lease at your recertification time, December 01, 2021. There have been violations noted on your account, some of which are related to your conduct towards staff that has interfered with them do [*sic*] their job efficiently."

50. The Eviction Notice identified a July 30, 2021 lease violation for an unauthorized person in unit and cited the Subject Property's House Rules for "Conduct," but it did not explain how Complainant violated the House Rules. No evidence was supplied in support of the Eviction Notice.

8

51. Defendant Thompson directed the issuance of and approved the Eviction Notice.

52. On or about October 14, 2021, Complainant timely requested a meeting to appeal the Eviction Notice.

53. On or about November 3, 2021, Complainant attended an informal hearing to appeal the Eviction Notice. Present at the hearing were Complainant, Defendant Thompson, and a hearing officer. The hearing officer was an attorney who identified himself as counsel for Defendant HHA yet stated that he would serve as a "neutral third party" and did not "have any vested interest" in the dispute.

54. At the hearing, Complainant denied the purported violations and explained why they were unfounded.

55. As reflected in an audio recording of the hearing, Defendant Thompson stated, "I told Ms. Santos, based on the emails that she sends to staff and her accusations, that we have the right as the owner to not renew [a] lease. A lease on a HUD property is not automatically renewed."

56. Defendant Thompson also stated, "One of the reasons why we have selected and decided not to renew Ms. Santos' lease is because the fact that existing staff at that time felt that she was very antagonizing, and very, um, um, very, um, just almost intimidating, with accusations and false allegations."

57. On or about November 8, 2021, the hearing officer issued a decision upholding the Eviction Notice, stating that "[t]he allegations contained in the Notice of Lease Termination were found to be true by your own admissions to the averments alleged in the notice and based on a preponderance of evidence presented at the hearing." The decision directed Complainant to vacate her unit by November 30, 2021.

9

58. On or about February 2, 2022, Complainant amended her fair housing complaint with HUD and added Defendant HPMMS.

59. On or about February 22, 2022, Defendants received notice of Complainant's amended complaint by certified mail from HUD.

60. On or about March 18, 2022, Defendant HPMMS initiated eviction proceedings against Complainant in Liberty County Court.

61. On or about December 13, 2022, a writ of possession was executed on Complainant's home, and she and her five children were evicted.

62. Tenants at the Subject Property who did not file fair housing complaints with HUD were treated more favorably than Complainant in the face of similar purported lease violations.

### HUD ADMINISTRATIVE PROCESS

63. On or about September 21, 2021, Complainant filed a timely complaint of housing discrimination with HUD, pursuant to 42 U.S.C. § 3610(a), naming Defendant HHA, Defendant HLHC, Defendant Thompson, Ms. Ogden, and Mr. Turner as respondents.  On or about February 2, 2022, Complainant timely amended her complaint and added Defendant HPMMS.

64. Pursuant to 42 U.S.C. § 3610, the Secretary of HUD conducted and completed an investigation of the complaint, attempted conciliation without success, and prepared a final investigative report.  Based on the information gathered in the investigation, the Secretary, pursuant to 42 U.S.C. § 3610(g)(1), determined that reasonable cause existed to believe that Defendants violated the Fair Housing Act.  Accordingly, on June 6, 2023, the Secretary issued a Charge of Discrimination under 42 U.S.C. § 3610(g)(2)(A).

10

65. On June 9, 2023, Complainant elected to have the charge resolved in a federal civil action under 42 U.S.C. § 3612(a). On June 14, 2023, an Administrative Law Judge dismissed the administrative proceeding from the docket pursuant to Complainant's timely election.

66. The Secretary of HUD subsequently authorized the Attorney General to file this action on behalf of Complainant under 42 U.S.C. § 3612(o).

67. Beginning on July 3, 2023, the United States and Defendants have agreed to toll the expiration of the statute of limitations in this action up to and including September 30, 2023.

## CLAIM FOR RELIEF

68. Plaintiff re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 67, above.

69. By the actions and statements referred to in the foregoing paragraphs, Defendants have coerced, intimidated, threatened, or interfered with a person in the exercise or enjoyment of, or on account of her having exercised or enjoyed, or on account of her having aided or encouraged any other person in the exercise or enjoyment of, a right granted or protected by 42 U.S.C. § 3604, in violation of 42 U.S.C. § 3617.

70. Defendants' conduct caused Complainant to be injured and suffer damages, including, but not limited to, emotional distress, pain and suffering, lost housing opportunity, rental fees, and out-of-pocket expenses, and interfered with her ability to secure and maintain rental housing for herself and her family.

71. Complainant is an "aggrieved person" within the meaning of 42 U.S.C. § 3602(i).

72. The discriminatory actions of Defendants were intentional, willful, and taken in reckless disregard of the rights of Complainant.

## PRAYER FOR RELIEF

WHEREFORE, the United States requests relief as follows:

1. A declaration that the discriminatory conduct of Defendants as set forth above violates the Fair Housing Act;

2. An injunction against Defendants, their agents, employees, successors, and all other persons in active concert or participation with any of them from:

   a. Coercion, intimidation, threats, or interference in violation of 42 U.S.C. § 3617;

   b. Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, Complainant to the position she would have been in but for the unlawful conduct; and

   c. Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any conduct in violation of the Fair Housing Act in the future;

3. An award of monetary damages to Complainant pursuant to 42 U.S.C. §§ 3612(o)(3) and 3613(c)(1); and

4. The United States further requests such additional relief as the interests of justice may require.

Dated: September 29, 2023

JILL E. STEINBERG
United States Attorney
Southern District of Georgia

*/s/ Bradford C. Patrick*

BRADFORD C. PATRICK
*Co-lead Counsel*
Assistant United States Attorney
Southern District of Georgia
South Carolina Bar No. 102092
P.O. Box 8970
Savannah, GA 31412
Phone: (912) 652-4422
Fax: (912) 652-4427
bradford.patrick@usdoj.gov

Respectfully submitted,

MERRICK GARLAND
Attorney General

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

CARRIE PAGNUCCO
Chief

*/s/ Melissa A. Carrington*

ANDREA K. STEINACKER
Special Litigation Counsel
MELISSA A. CARRINGTON
*Co-lead Counsel*
Trial Attorney
Housing and Civil Enforcement Section
Civil Rights Division
U.S. Department of Justice
Iowa Bar No. 13033
150 M Street, NE
Washington, DC 20530
Phone: (202) 353-5249
Fax: (202) 514-1116
E-mail: Melissa.Carrington2@usdoj.gov

Attorneys for Plaintiff
United States of America